**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **DERICK L. CAMPBELL,** | ) | **CASE NO. 1:09CV2968** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **NORFOLK SOUTHERN RAILWAY** | ) | |
| **CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | **REPORT AND RECOMMENDATION** |

On September 14, 2010, this matter was referred pursuant to Local Rule 72.1 for supervision of all pretrial matters to include recommendations on dispositive motions.  (Doc. No. 18.)  Presently before the Court is Defendant's fully-briefed motion for summary judgment. (Doc. Nos. 36, 41, & 49.)  For the reasons set forth below, the Court recommends that the motion be granted.

## I.  Procedural History

On December 22, 2009, Derick L. Campbell ("Campbell") filed a Complaint against Norfolk Southern Railway Co. ("Norfolk Southern") raising nine counts as follows: (1) race discrimination due to a hostile work environment based upon 42 U.S.C. § 2000e, *et seq*., Title VII of the Civil Rights Act of 1964, as amended, 1991; (2) race discrimination due to a hostile work environment based upon 42 U.S.C. § 1981; (3) race discrimination due to a hostile work environment based upon Ohio Revised Code ("O.R.C.") § 4112.02(A); (4) failure to promote based upon race discrimination pursuant to Title VII; (5) failure to promote based upon race discrimination pursuant to § 1981; (6) failure to promote based upon race discrimination pursuant to Ohio law; (7) retaliation due to discriminatory harassment under Title VII; (8) retaliation due to discriminatory harassment under § 1981; and, (9) retaliation due to

discriminatory harassment under Ohio law .[1]  (Doc. No. 1.)  On January 13, 2010, Norfolk Southern filed its Answer denying the allegations.  (Doc. No. 3.)

On November 10, 2011, Norfolk Southern filed a Motion for Summary Judgment.  (Doc. No. 36.)  On December 27, 2011, Campbell filed a responsive brief, to which Norfolk Southern replied on January 27, 2012.  (Doc. Nos. 41, 49.)

## II.  Facts

Campbell, an African American, began working at Norfolk Southern in 1992 as a conductor.  (Campbell Dep., 16.)[2]  He became an engineer in 1995.  *Id*. at 17.  In both positions, he was a union member.  *Id*. at 18.  On October 1, 2006, Campbell was promoted to "Road Foreman of Engines," a management position in the Dearborn Division.  (*Id*. at 18-20; Irvin Decl., ¶ 3.)  This non-union position is responsible for supervising and training locomotive engineers, including trainees, in an assigned territory.  (Sherman, Decl. ¶ 4.)  Road Foremen ensure that the engineers under their supervision perform their jobs adequately, safely, and in full compliance with company rules and federal regulations.  (Sherman, Decl., ¶ 5.)  Road Foremen have designated off days, but otherwise are on call 24 hours a day, 7 days a week, to address issues that may arise.  (Sherman Decl., ¶ 17.)

From October, 2006, through October, 2008, Campbell's supervisor was Division Road Foreman H. Lantz Blanton, a white male.  (Campbell Dep., 29.)  Campbell alleges several racially motivated interactions with Blanton.  A timeline of the alleged adverse employment actions, construed in the light most favorable to Campbell as the non-moving party, is as follows:   **(1) Delayed Vacation - 2007**

Campbell alleges that in 2007, Blanton ordered Campbell to work the weekend before his scheduled vacation week.  (Campbell Dep., 67.)  Campbell contends that he had to work because

---

[1]Campbell filed the Complaint *pro se*, but is now represented by counsel, and has been since April 20, 2010.  (Doc. Nos. 11 &16.)

[2]Campbell's deposition is in two volumes.  The first volume is noted "Campbell Dep." while the second volume is noted as "Campbell Dep. II."

Anthony Penix, another Road Foreman and friend of Blanton, was on vacation.  *Id.*  Campbell further contends that his vacation had been scheduled prior to the time Penix was promoted to the Road Foreman position.  (Campbell Dep., 67-68.)  Blanton's order delayed Campbell's vacation.  *Id.*

**(2) Delayed Vacation - 2008**

Similarly, Campbell alleges that in 2008, Blanton mandated that he handle a disciplinary situation involving a locomotive engineer trainee on the Saturday before his scheduled vacation. (Campbell, Dep., 67.)  Campbell contends that another Road Foreman could have handled the situation.  (Campbell, Dep. 67.)  Again, his vacation was delayed.

**(3) 2008 Performance Evaluation**

Campbell alleges that Blanton gave him a less-than-favorable performance evaluation in 2008.  (Compl., ¶13.)  Campbell claims that an initial version of the performance review, which he did not agree with, indicated that he needed to improve his relationship with a particular employee.  (Campbell Dep., 29-30.)  Blanton and Campbell discussed the evaluation, and at Campbell's request, Blanton agreed to remove the comment from the evaluation.  (Campbell Dep., 43.)  This, Campbell agreed, made it a "favorable" evaluation.  (Campbell Dep., 62.)

**(4) Racial Comment Blanton Made to Another Supervisor**

Campbell alleges that Blanton made a racist remark to Ben Sheppard, Trainmaster, about interracial marriages.  Specifically, the comment was "[you] must think it's okay for black people and white people to marry, too."  Campbell subsequently heard about the comment through Jeff Allen, also a Road Foreman in the Dearborn Division.  (Campbell Dep. 68-70.) Campbell indicates that it was common knowledge that he had a white girlfriend.  (Sheppard Dep. 18-19; Allen Dep. 15.)  Blanton denied that he knew Campell was dating a Caucasian. (Blanton Dep. 65.)

**(5) Gun Incident**

In August, 2008, Campbell developed diverticulitis.  (Campbell Dep., 64-66, 126-131.) Several days prior to August 18, 2008, he experienced lower abdominal pain.  (Campbell Dep., 126.)  On August 18, 2008, Campbell (after returning home from work at 4:30 a.m.) received a

3

call from Blanton at 11:00 a.m., requesting him to drive a locomotive simulator more than 200 miles from Toledo, Ohio, to Western Pennsylvania. (Campbell Dep., 64.) Campbell told Blanton he was experiencing severe pain and needed to see a physician. (Campbell Dep., 64-66, 127-131.) Campbell asked if another Road Foreman, Jeff Allen[3], could fill in for him. *Id*. Blanton said no. *Id*.

Campbell met Blanton in the parking lot where the simulator was located. (Campbell Dep., 65.) Allen was also present. (Campbell Dep., 121, Ex. 7.) Campbell again told Blanton that he was sick and asked Blanton to send Allen instead, or at least allow Allen to accompany him. (Campbell Dep., 64-66, 126-131, Allen Dep., 12-13; Blanton Dep., 71.) Blanton again denied the requests. *Id*. Blanton, sitting in his car during this conversation, reached into the door compartment, picked up a Beretta pistol, and displayed it in Campbell's direction, saying, "Why don't you just turn around and let me shoot you in the back of the head and put you out of your misery?" (Campbell Dep., 64-66; 123; 127-31; 134-137; Allen Dep., 17-22; Blanton Dep., 79-81.) Blanton claims only to have reached for the handle of the pistol from the compartment far enough to show it to the men, but at his deposition, he also said, "I'm not positive." (Blanton Dep., 80-81.) Blanton also testified that he intended the comment as a joke and believed that Campbell perceived it as such. (Blanton, Dep., 82.) Campbell testified that although he did not know why Blanton made this comment, he believed it was because Blanton knew he was sick and did not want to drive the simulator to Pennsylvania. (Campbell Dep II, 20-21.) Norfolk Southern has not challenged Campbell's recollection of this incident. (Doc. No. 36-1, p. 4, fn. 5.)

**(6) Telephone Calls Received while on Sick Leave**

Campbell drove the simulator to Pennsylvania, and upon his return he experienced extreme abdominal pain. (Campbell, Dep. 65.) On August 19, 2008, he went to see his doctor, who ordered Campbell not to return to work until August 25, 2008. *Id*. Despite Campbell informing Blanton of the doctor's order, Blanton attempted to call Campbell multiple times on

---

[3]Allen is also an African-American.

4

August 22, 2008 (late Thursday/early Friday), but Campbell did not answer his phone. (Campbell Dep. 66; Bond Decl., Exh. 1.)  The next day Campbell returned Blanton's calls and found out that Blanton was trying to reach him to address a violation committed by one of the engineers.  Blanton told Campbell that being sick was not a good reason to be unresponsive to his calls.  (Bond Decl., Exh. 1.)

Campbell's condition worsened and he was hospitalized from August 23, 2008, until August 27, 2008.  (Campbell Dep., 126.)  On September 25, 2008, Campbell called Norfolk Southern's Equal Employment Opportunity ("EEO")  hotline, leaving an unspecified message regarding the alleged racial harassment by Blanton.  (Bond Decl., ¶ 3.)

On September 28, 2008, Campbell had a serious medical condition that required emergency surgery.  *Id*.  The next day, following surgery, Campbell contacted Superintendent Mike Irvin, advising him of his current medical condition as well as the issues he had with Blanton, including the gun incident.  (Bond Decl., Exh. 1; Campbell Dep., 138-139.)  Irvin, wanting to be sure he understood, twice asked Campbell if Blanton's action regarding the gun was in jest.  (Irvin Dep., 93-95.)  Irvin also contacted Blanton and Allen requesting each to write a statement as to the August 18, 2008 incident.

Blanton's statement to Irvin was as follows:

Mr. Irvin:
On August 18th 2008 Jeff Allen, Derick Campbell and I were in the parking lot just east of the Lower Level.  I was seated in my Jeep with the door open listening to Derick give me a list of all the physical ailments he had been experiencing the past couple of days.  When he finished I lifted the butt of a small handgun out of the side console of my Jeep and told him he might be better off if I just shot him.  All three of us had a good laugh and continued our conversation for a few minutes before I departed.
Lantz Blanton

(Doc. No. 36-8 at 4.)

Allen's statement regarding the gun incident was as follows:

Mr. Irvin:
On 18 August 2008, I RFE J.L. Allen and DRFE H.L. Blanton & RFE D.L. Campbell, were talking and joking at the lower level CD287 parking area around the RFE & Trainmaster office.  RFE D.L. Campbell stated to the DRFE that he was not feeling well and that he was going to see his physician.  DRFE H.L. Blanton was sitting in his vehicle and reach[ed] down and displayed a small hand gun and said to RFE D.L. Campbell turn around and let me shot [sic] in the back

5

of your head and put you out of your misery." End of Statement. J.L. Allen RFE Toledo West

(Doc. No. 36-8 at 5.)  At Allen's deposition, he clarified that the gun was displayed towards Campbell, not pointed at him.  (Allen Dep., 11, 17.)  Allen also testified that he did not believe the gun incident was a race issue (Allen Dep., 12), but later implied that such an incident by a white man raised in the south would be intimidating to a black employee.  (Allen Dep., 22.)

Irvin immediately contacted Derek Bond, an employee in Norfolk Southern's EEO department, to investigate the incident,[4] and recommend an appropriate disciplinary response concerning Blanton.  (Irvin Decl., ¶¶ 7, 9.)  Irvin also immediately contacted Blanton to inform him that his conduct was unacceptable and would not be tolerated.  *Id*.  On approximately October 4, 2008, Blanton contacted Campbell and apologized for the gun incident.  (Campbell Dep II, 60.)

In the meantime, the EEO office made several attempts to contact Campbell, finally reaching him on September 29, 2008.  (Bond Decl., ¶ 4.)  Campbell, however, was unable to speak as he had just undergone surgery.  *Id*.

On October 10, 2008, Campbell returned Bond's phone call, providing details.  (Bond Decl., 7.)  Campbell described the August 18, 2008 gun incident.  *Id* at 7-8.  Campbell also complained about the two scheduling incidents where Blanton required him to work on the weekend prior to his vacation, and about the voicemail messages he received from Blanton on August 22, 2008, while out on medical leave.  (Bond Decl., ¶ 9.)  Campbell told Bond that Blanton had apologized for the gun incident, but Campbell said he was not satisfied with the apology, and that he felt harassed.  (Bond Decl., ¶ 10.)  Campbell did not tell Bond that he perceived the gun incident to be threatening.  (Bond Decl., ¶ 8.)  Campbell returned to work in

---

[4]The EEO department investigates any complaints by non-agreement (*i.e.* management or supervisory) employees concerning their supervisors, regardless of whether a complaint is related to race, gender, or another protected characteristic.  (Cobbs Dep., 9.)

6

March, 2009.[5]  (Campbell Dep., 126-127.)

Bond completed his investigation and prepared a summary of his findings, which was reviewed by management.  (Bond Decl., ¶¶ 11, 12; Cobbs Decl., ¶ 3.)  On October 14, 2008, Assistant Vice President of Diversity & EEO Director R. David Cobbs, Jr., recommended that Blanton be terminated from his supervisory position.  (Cobbs Decl., ¶ 5.)  The Transportation Department agreed.  (Cobbs Decl., ¶ 6.)

On October 15, 2008, Blanton met with his supervisors and was offered two options: he could be terminated with severance pay or he could return to a union position.  (Blanton Dep., 118.)  The collective bargaining agreement between Norfolk Southern and the Brotherhood of Locomotive Engineers & Trainmen ("BLET") allows managers who formerly were engineers to maintain their seniority and to make a "bumping" move (or exercising their seniority) back into the union ranks at any time, even if they were fired from a manager's position.  (Cobbs Decl., ¶ 8.)  Blanton, who began his career with Norfolk Southern as a BLET union member, exercised his seniority and took an engineer position in Asheville, North Carolina.  (Cobbs, Decl. ¶ 9.)

After the gun incident, Campbell had no further contact with Blanton, except for his apology on October 6, 2008.  (Campbell Dep II, 57.)

Campbell claims that he became known as "the most hated person on the Dearborn line" for causing Blanton to lose his management position.  (Campbell Dep. 109, 112-114.)  Campbell also alleges that he was retaliated against when the new Division Road Foreman Aaron Sherman (replacing Blanton) adopted a policy which Campbell indicates is known as "the Derick Campbell Rule."  (Campbell Dep. 110-112.)  Part of Campbell's job, in accordance with federal regulations, involves certain operational monitoring observations, including whether locomotive engineers have the ability to adequately control the speed of a locomotive.  (Sherman Decl., ¶ 10.)  Road Foremen are required to ride with an engineer for at least 50 miles at least once per calendar year.  *Id.* at ¶ 7.  About one year after Sherman became the Division Road Foreman in

---

[5]The record reflects that during this time period Campbell was terminated, but immediately reinstated to the same position.  (Doc. No. 36-4, Campbell Dep. II, 42.)

the Dearborn Division, he decided to increase the observational train rides to 75 miles as he determined there were insufficient speed changes in the 50 mile train ride to adequately observe the engineer's ability to control the train.  *Id*. at ¶¶ 8, 12, 13.  Campbell testified that Sherman sent him, and no other Road Foremen, the following email on July 8, 2009:

> For your review.
>
> I would like to see a [sic] something different when you are conducting your train rides.  I know that the minimum is 50 miles, but I really don't think that running 50 miles on clear signals, gives us an opportunity to accurately judge the employees ability to control the train, monitor rules compliance and performance.
>
> Any suggestions?

(Doc. No. 47-2.)  Campbell claims that this email directs him "to go more than 50 mph [sic] that he did not send to any other Road Foreman."  (Campbell Decl., ¶ 3.)

Campbell further claims that the Assistant Division Manager Mike Wilson, who runs daily operations, harassed him by giving him contradictory information regarding documentation of a possible crew injury for which Campbell could have been held responsible.  (Doc. No. 41 at 26.)  Wilson also screamed at him over the telephone, used a derogatory tone of voice, and hung up the telephone abruptly.  *Id*.

Lastly, Campbell alleges that race was a factor for not being selected to any of the positions he applied for; and, that Norfolk Southern hired less qualified white employees instead. (Campbell Compl., ¶¶ 12, 50-64; Campbell Dep II, 104-133.)  Between October, 2006, and December, 2009, Campbell unsuccessfully applied for a variety of positions within Norfolk Southern that were at an equal or higher salary level than his Road Foreman position.  Three of the positions for which Campbell applied were in higher pay bands: Manager, Vehicle Mixing Center; Market Manager National Accounts; and, System General Superintendent Operations.[6] (Maye Decl., 4.)  Campbell also applied for eight positions approximately equal in pay to his current position: Senior General Foreman, Manager of Intermodal Operations; Piermaster;

---

[6]Campbell's Road Foreman of Engines position is classified at a Band 4 position, paying over $82,000 per year.  (Campbell Dep. 22.)  The three named positions are all Band 5 positions. (Doc. No. 36-1, fn. 11.)

District Claim Agent; Trainmaster; Assistant General Superintendent Operations; Division

Manager, Intermodal; and, Manager, Traffic Delivery.  (Maye Decl., ¶ 5.)

       Decisions to fill open positions are made by, or in close consultation with, Norfolk

Southern's Human Resource ("HR") Generalists located in Norfolk, Virginia.  (Maye Decl., ¶ 6.)

HR Generalists evaluate or "screen" the applicants, identify the most qualified candidates, and

then send a pool of qualified candidates to the hiring manager responsible for conducting the

interviews.  *Id*.

       Lewis Maye, an HR Generalist for Norfolk Southern, was responsible for evaluating the

applicants and developing a candidate pool for the majority of positions Campbell applied for.[7]

(Maye Decl., ¶ 6.)  Maye testified that he did not know Derick Campbell's race when he was

looking for competitive candidates.  (Doc. No. 44-2, Maye Dep., 36; Doc. No. 36-10, Maye

Decl., ¶ 7.)  Campbell interviewed for the position of Piermaster, but was not selected.  (Maye

Decl., ¶ 17.)  After the interview, he was found not to be the most qualified candidate.  *Id*.  As

for the other positions Campbell sought, the H.R. generalists determined that Campbell was not

selected as he lacked the necessary experience and qualifications.  (Maye Decl., ¶¶ 6, 16.)

       On November 3, 2008, Campbell filed a timely complaint alleging race discrimination

with the Ohio Civil Rights Commission.  (Compl., ¶ 7.)  On September 22, 2009, he received a

Plaintiff's Right to Sue Notice from the United States Equal Employment Opportunity

Commission.  (Compl., ¶ 8.)

       Norfolk Southern has moved for summary judgment, claiming that Campbell has not

presented sufficient evidence to establish a *prima facie* case of hostile work environment, racial

discrimination, or retaliation.

### III.  Summary Judgment Standard

       Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

       The court shall grant summary judgment if the movant shows that there is no

---

[7]Maye did not review the positions of Piermaster, District Claim Agent, Law, and
Trainmaster.  (Maye Decl., ¶ 16.)  H.R. Generalists, no longer working at Norfolk & Southern,
evaluated these positions.  *Id*.

9

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.  "[T]he [non-moving party] must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the [moving party], as long as the [non-moving party] has had a full opportunity to conduct discovery." *Liberty Lobby*, 477 U.S. at 257.

### IV.  Law & Analysis

#### A. Hostile Work Environment

In Counts One through Three, Campbell claims race discrimination based upon a hostile work environment.[8]  (Compl., ¶¶ 29-49.)  Norfolk Southern asserts that Campbell has not

---

[8]The Complaint sets forth identical claims under Title VII, § 1981, and Ohio law.  Hostile work environment claims brought under § 1981 and Ohio law are analyzed under the Title VII

established a *prima facie* case, *i.e.*, he has not proven harassment based upon race or that the alleged conduct was severe and pervasive.  (Doc. Nos. 36-1 at 10-18; 49 at 2-15.)  Campbell contends that he has set forth direct evidence of harassing conduct and he has established a genuine issue of material fact.  (Doc. No 41 at 20-25.)

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] religion." 42 U.S.C. § 2000e-2(a)(1).  The scope of prohibition is not limited to economic or tangible discrimination.  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  In order to establish a claim under Title VII, plaintiffs must produce either direct or circumstantial evidence of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  Direct evidence proves the existence of a fact without requiring any inferences.  *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004); *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).  Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Once a plaintiff produces direct evidence, the burden shifts to the employer to show that it would have taken the employment action even in the absence of discrimination.  *Id.*; *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 71 (6th Cir. 2006).

Campbell contends that Blanton's conduct is direct evidence of racial discrimination contributing to a hostile work environment.  (Doc. No. 41 at 20-24.)  Campbell argues that Blanton's conduct demonstrates racial animus as (1) he carried a gun for fear of being in "high crime areas;" (2) displayed racial animus by pointedly baiting a white co-worker with the

---

evidentiary framework.  *See Mitchell v. Toledo Hosp.*, 964 f.2d 577, 582 (6th Cir. 1992) (holding discrimination claims under § 1981 are analyzed under the Title VII evidentiary framework); *Satterfield v. Karnes*, 736 F.Supp.2d 1138, 1157 (S.D. Ohio 2010) (holding hostile work environment claims under O.R.C. § 4112 are also analyzed under the same framework as Title VII).

comment ("So you think it's okay for black people and white people to marry?"); (3) criticized Campbell for not getting along with a prejudiced white trainmaster; (4) ordered Campbell, while he was sick, to drive the simulator to Pennsylvania while displaying a firearm; (5) told Campbell to "turn around and let me shoot you in the back of the head and put you out of your misery;" and, (6) displayed a pattern of disfavoring Campbell, over white employees, on matters of vacation scheduling and work assignments. (Doc. No. 41 at 22.) Campbell also contends that Blanton's conduct was "extremely serious," especially the gun incident, and that it altered Campbell's terms and conditions of employment, causing Campbell "mental anguish" and "sleepless nights." (Doc. No. 41 at 24-25.) Lastly, Campbell contends that after returning to work from medical leave, people appeared to hold him responsible for Blanton losing his management position. (Campbell Dep. 109, 112-114.) Campbell draws an inference that Blanton is a racist because he was raised in Mississippi and lived much of his adult life in North Carolina and Alabama.. (Doc. No. 41 at 21-22.) Campbell's arguments are based upon inferences of discrimination, rather than direct evidence. Therefore, in order to prevail, the Court must review any circumstantial evidence of discrimination using the *McDonnell-Douglas* framework. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish race discrimination based upon a hostile work environment, Campbell must show: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and, (5) employer liability. *Williams v. General Motors Corp*., 187 F.3d 553, 561 (6th Cir. 1999); *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999). In addition, Title VII is violated when the discrimination is so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992).

To assess the fourth prong of an asserted *prima facie* case, federal courts must examine the totality of the circumstances. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Thornton v. Fed.*

12

*Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). Courts shall consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *see also Williams v. GMC*, 187 F.3d 553, 560-62 (6th Cir. 1999). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment...." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[S]imple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (internal citation and quotation marks omitted). Courts must consider the work environment as a whole, rather than focus on individual acts of alleged hostility. *Perkins v. Harvey*, 368 Fed. App'x 640, 646 (6th Cir. 2010) (*citing Bowman v. Shawnee State Univ*., 220 F.3d 456, 464 (6th Cir. 2000).

  The Sixth Circuit has found harassment affects a term or condition of employment when the alleged conduct constitutes an unreasonably abusive or offensive work-related environment or adversely affects the employee's ability to do his job. *Bailey v. USF Holland, Inc*., 526 F.3d 880, 886 (6th Cir. 2008) (*citing Moore v. KUKA Welding Sys. & Robot Corp*., 171 F.3d 1073, 1079 (6th Cir. 1999)). The *Bailey* Court found a hostile work environment after six years of persistent harassment, including repeated, racially motivated use of the term "boy" in addressing African-American co-workers and in graffiti in the workplace. *Id*.

  Additionally, courts may consider acts of harassment directed at others that occurred outside of the plaintiff's presence, but which the plaintiff learned about during his employment with the defendant. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335-37 (6th Cir. 2008) (similar acts of harassment occurring outside of plaintiff's presence may be evidence of hostile work environment if plaintiff was aware of them during her employment) (citing cases); *Abeita v. TransAmerica Mailings*, 159 F.3d 246, 249 n. 4 (6th Cir. 1998) (instances of harassment of other employees irrelevant if "there is no evidence that plaintiff was aware" of them); *Jackson v. Quanex*, 191 F.3d 647, 660 (1999).

  The Eleventh Circuit has found that conduct far more severe or pervasive than what

Campbell has alleged here, failed to meet the threshold of proof.[9]  *Williams v. H. Lee Moffitt Cancer Center and Research Institute, Inc.*, 2010 WL 5058513, *8 (M.D. Fla. Dec. 6, 2010); *see e.g., Godoy v. Habersham County*, 211 Fed. Appx. 850, 853-854 (11th Cir. 2006) (summary judgment affirmed where South-American plaintiff claimed he was subject to racial slurs "almost every shift," and that his supervisor battered him and told him "to go back to his boat and sail to South America where he belongs"); *Barrow v. Ga. Pacific Corp*., 144 Fed. Appx. 54, 57 (11th Cir. 2005) (summary judgment affirmed where black employee claimed his superintendent told him several times that he was "going to kick [his] black ass"; witnessed numerous other forms of racially offensive conduct and comments; saw the rebel flag on tool boxes and hard hats and "KKK" on the bathroom wall and on a block console; saw a noose in another employee's locker; was called a "nigger" by his supervisor and told he would be "cut" if he looked at "that white girl"; and, was called "black boy" and "dumb ass" by two other supervisors); *Williams v. JPI Jones Pharm*., No. 8:03-cv-2561-T-30MAP, 2005 U.S. Dist. LEXIS 15429, at *4, 2005 WL 1863402 (M.D. Fla. Jul. 29, 2005) (summary judgment granted where plaintiff alleged that co-workers made derogatory racial jokes and her supervisor remarked that she had "too many blacks in her department"); *Lawrence v. Wal-Mart Stores, Inc*., 236 F.Supp.2d 1314, 1318-19, 1325 (M.D. Fla. 2002) (summary judgment granted where manager made threats to an African-American employee such as "I have that gun [like the one that was missing from the store] at home along with several more at home just like it to shoot blacks," while patting him on the back, and explaining during another occasion after plaintiff received positive feedback from upper management "we don't like heroes ... remember how we

---

[9]In the Eleventh Circuit, to establish a hostile work environment, a plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic; and 4) the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the terms or conditions of employment and to create an abusive working environment.  *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002); *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 647 (11th Cir. 1997) (*citing Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).  A plaintiff also must show the employer is either directly or vicariously liable for the abusive environment. *Miller*, 277 F.3d at 1275.

14

did blacks back in the thirties when they got out of hand ... we would take them out back and lynch them"; plaintiff was also told he was a "Jesse Jackson type black guy" and referred to as "homeboy" and "boy" on a couple of occasions).

In the instant matter, Campbell was ill and could not call the EEO office immediately after the gun incident.  (Campbell Dep., 123-124.)  According to Irvin, Campbell reported that "the firearm was displayed in a joking matter."  (Doc. No. 36-8 at 4.)  Campbell, however, challenges the accuracy of Irvin's statement.  Campbell testified that it was a "fearful situation." (Campbell Dep., 135-137.)  Even if the gun incident is considered to be severe, the Court finds that Campbell has not established that it was racially motivated.  Campbell admits that Blanton's comment about "putting [Campbell] out of his misery" referred to Campbell's pain, not the fact that he was black.  (Campbell Dep. II, 20-21.)

The isolated comment about interracial marriage during a conversation with another employee does not establish that Blanton's conduct towards Campbell was motivated by racial animosity.  *See Bowman*, 220 F.3d at 464 (The court held that other alleged acts of harassment by the same supervisor "[could] not be considered in the hostile work environment analysis" as the plaintiff did not show such conduct was based upon discriminatory harassment); *Manessis v. New York City Dept. of Transp.*, 2003 WL 289969 (2d Cir. Feb. 10, 2003) (The court held that "two arguably discriminatory comments . . . cannot support an inference that the other eight incidents were motivated by discriminatory animus.")

The other alleged racially motivated acts regarding vacation scheduling, work assignment, telephone calls, and performance evaluations all involved ordinary workplace issues.  Campbell has not established that race was a factor in these incidents.  The U.S. Supreme Court has made clear that it is "important to distinguish between harassment and discriminatory harassment in order to ensure that Title VII does not become a general civility code . . . [regulating] the ordinary tribulations of the workplace."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Campbell has failed to establish a genuine issue of material fact that Blanton's conduct was based on race.  The Court, therefore, recommends that Norfolk Southern's motion for

summary judgment be granted as to Counts One, Two and Three.

###### B.  Failure to Promote based on Race Discrimination

In Counts Four, Five, and Six, Campbell asserts claims for failure to promote under Title VII, § 1981, and Ohio law.  (Compl., ¶¶ 50-64.)  The § 1981 and Ohio claims are analyzed under the Title VII evidentiary framework.  *See Evans v. Toys R Us-Ohio, Inc.,* 32 F.Supp.2d 974, 983 (S.D. Ohio 1999) (The court simultaneously reviewed state and federal discrimination claims for failure to promote under Title VII.)

Relying on Fourth Circuit law, Norfolk Southern contends that Campbell has not established a *prima facie* case of discriminatory failure to hire because his applications for the positions were not rejected "under circumstances giving rise to an inference of unlawful discrimination."  *Carter v. Ball,* 33 F.3d 450 (4th Cir. 1994).  Norfolk Southern also contends that because the Human Resource Generalists were unaware of Campbell's race during the review process, it was not a factor.  (Doc. No. 36-1 at 22-23.)

Campbell argues that Norfolk Southern's vetting process is inadequate as it does not document its reasons supporting promotion placement decisions.  (Doc. No. 41 at 28.)  Specifically, he asserts that because there was no documentation, HR generalists could only speculate as to the basis for a selection.  *Id*.

In the Sixth Circuit, to prove a *prima facie* case of discriminatory refusal to promote, a plaintiff must establish  that (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.  *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005).  Regarding the fourth prong, the *White* Court held that it is incumbent upon the plaintiff to establish that he, and the non-protected person who ultimately was hired for the desired position, had similar qualifications.  *See Williams v. Columbus Metro. Hous. Auth.,* 90 Fed. App'x 870, 873 (6th Cir. 2004); *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir. 2003); *Nguyen v. City of Cleveland,* 229 F.3d 559, 562-63 (6th Cir. 2000).

16

In holding that such a comparison is necessary for a plaintiff to meet his *prima facie* burden, the *White* Court was mindful of the fact that prior Sixth Circuit case law warns against conflating the first (*prima facie* case) and second (articulation of a legitimate non-discriminatory reason) steps in the *McDonnell-Douglas* analysis.  *White,* 429 F.3d 240; *see Cicero v. Borg-Warner Auto., Inc*., 280 F.3d 579, 584-85 (6th Cir. 2002); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000).  Case law indicates that courts engage in impermissible consideration of the defendant's proffered legitimate non-discriminatory reason during the first step of the *McDonnell Douglas* analysis when they cite the defendant's proffered reason in finding that the plaintiff is not qualified for the position.  In considering whether a plaintiff is qualified, the case law is clear that "[a] court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge ... [and] be careful not to conflate the distinct stages of the *McDonnell Douglas test*."  *White,* 429 F.3d 240*; Cicero*, 280 F.3d at 585 (*citing Cline*, 206 F.3d at 660-61).

Here, Campbell fails to satisfy the fourth prong in that he does not provide evidence that he had similar qualifications as the other candidates let alone that he was qualified for the positions.  Even if Campbell had been able to satisfy his *prima facie* burden, his claim would fail because Norfolk Southern has produced legitimate non-discriminatory business reasons for denying him the relevant positions.

If the plaintiff meets his *prima facie* burden, the employer must then produce a legitimate non-discriminatory reason for not promoting plaintiff.  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S.Ct. 1089 (1981) (*citing McDonnell Douglas Corp.*, 411 U.S. 792); *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003).  Although Campbell did not demonstrate his qualifications, Norfolk Southern has articulated legitimate non-discriminatory reasons for not offering Campbell any of the positions.  With respect to each job, Norfolk Southern submitted evidence through Maye, an H.R. Generalist, to support the decisions to reject Campbell.

### 1. Manager, Vehicle Mixing Center

This manager is responsible for coordinating the movement of rail traffic into and out of

17

the vehicle mixing center, where locomotives, railcars, and other vehicles are stored.  (Maye Decl. ¶ 8.)  This is a customer service position that involves working with a third-party company that leases and operates the mixing center.  *Id*.  A good candidate for this position would have customer service experience working in a vehicle mixing center or in automotive operations.  *Id*.  Campbell was not qualified as he did not have any customer service experience.  *Id*.  Valerie Young, the selectee, had strong customer service experience as a Manager of Vehicles and a Manager of Auto Parts.  *Id*.

### 2.  Market Manager, National Accounts

This manager is responsible for developing and executing marketing and sales plans based upon knowledge of the transportation market and Norfolk Southern's cost structure.  (Maye Decl., ¶ 9.)  A good candidate would have marketing and sales experience.  *Id*.  Campbell was not qualified as he did not have any marketing experience.  *Id*.  Randall Bayles, the selectee, had a master's degree in business with a specialization in transportation operations and logistics and a 4.0 GPA, as well as ten years of strong marketing experience as a Market Manager, International.  *Id*.

### 3.  Manager, Traffic Delivery

This manager is the primary contact for intermodal customers seeking to resolve marketing and operations questions, issues, and problems; for promptly resolving and preventing any reoccurrence of problems with customer shipments; and, for communicating proactively with operating personnel to prevent service failures.  (Maye Decl., ¶ 10.)  A good candidate for this position would have intermodal and customer service experience.  *Id*.  Campbell was not qualified because he did not have any intermodal or customer service experience.  *Id*.  Terry Forrey, the selectee, had eight years of customer service and intermodal experience as a Manager of Intermodal Service Delivery.  *Id*.

### 4.  System General Superintendent of Transportation, Customer Service

This position is responsible for managing the daily implementation of an operating plan to provide on-time train operation, efficient use of locomotives, and effective customer service; for monitoring train operations and shipments and identifying the need for extra trains to ensure

18

timely and efficient delivery of shipments; and, for developing alternative shipment plans in the case of emergency service disruptions.  (Maye Decl., ¶ 11.)  A good candidate for this position would have experience in customer service and in developing and managing train schedules.  *Id*.  Campbell was not qualified as he did not have any customer service experience or experience managing train schedules.  *Id*.  Rick Sansbury, the selectee, had strong customer service and train management experience as a Superintendent of Transportation and an Assistant General Superintendent.  *Id*.

### 5.  Senior General Foreman, Mechanical

This position is responsible for overseeing the inspection, maintenance and repair of locomotives and/or freight cars.  (Maye Decl., ¶ 12.)  A good candidate would typically have maintenance and repair experience working in a shop.  *Id*.  Campbell was not qualified as he did not have this type of experience.  *Id.*  James Roskovics, the selectee, had maintenance and repair experience as a Mechanical Supervisor and a General Foreman.  *Id*.

### 6.  Manager Operations, Intermodal

This manager is responsible for overseeing operations at the intermodal terminal, which includes ensuring that freight is unloaded, properly billed, loaded and released on schedule; working with IT personnel to correct any problems with the intermodal information system; and, overseeing the shipment and handling of hazardous materials in accordance with federal regulations and safety rules.  (Maye Decl., ¶ 13.)  A good candidate would typically have experience working with shipments at intermodal terminals.  *Id*.  Campbell did not have such experience.  *Id*.  George Martins, the selectee, had over nine years experience working at an intermodal terminal as an Assistant Manager of Intermodal Operations.  *Id*.

### 7.  Division Manager, Intermodal

This manager has many of the same duties as the Manager Operations, Intermodal, but on a division-wide basis, and is also responsible for developing a budget and ensuring that facilities have the necessary equipment and staffing.  (Maye Decl., ¶ 14.)  Campbell was not qualified as he did not have any intermodal experience.  *Id*.  Chris Jeselnik, the selectee, had over seven years of intermodal experience.  *Id*.

19

### 8.  Assistant General Superintendent Operations, Customer Service

This position is responsible for managing the daily implementation of an operating plan to provide on-time train operation, efficient use of locomotives, and effective customer service; for monitoring train operations and shipments and identifying the need for extra trains to ensure timely and efficient delivery of shipments; and, for developing alternative shipment plans in the case of emergency service disruptions.  (Maye Decl., ¶ 15.)  A good candidate would have experience in customer service and in developing and managing train schedules.  *Id*.  Campbell was not qualified as he did not have any customer service experience or experience managing train schedules.  *Id*.  Adam Andre, the selectee, had strong customer service and train management experience as a Superintendent of Operations.  *Id*.

### 9.  Piermaster[10]

This position is responsible for the safe, prompt, and efficient loading of vessels, and for coordinating the activities of the various railroad, transshipper and vessel personnel to provide for uninterrupted operation.  (Maye Decl., ¶ 17.)  A good candidate would have detailed knowledge of coal classifications and procedures used in ordering coal and loading vessels.  *Id*.  Even though Campbell had no experience working on a pier, classifying coal, or loading vessels, he was interviewed for this position.  *Id*.  He was found not to be the most qualified candidate.  *Id*.  Larry Freeman, the selectee, had several years of experience working on a pier, classifying coal, and managing the load of vessels as an Assistant Piermaster.  *Id*.

### 10.  District Claim Agent, Law

This position is responsible for supervising the investigation concerning facts about claims against or by Norfolk Southern for death or injury arising out of company activities within an assigned territory, and supervises and assists in the negotiation of reasonable settlements.  (Maye Decl., ¶ 19.)  A good candidate would have experience managing claims.  *Id*.

---

[10]The next three positions, Piermaster, District Claim Agent, Law, and Trainmaster were reviewed by other H.R. Generalists who no longer work for Norfolk Southern.  (Doc. No. 36-10, ¶ 16.)  Maye reviewed the documents regarding these positions, concluding that Campbell was not the most qualified person as explained.  *Id*.

Campbell did not have any claims experience.  *Id*.  Raymond Murphy, the selectee, had over ten years of experience as a Senior Claims Agent, Law.  *Id*.

### 11. Trainmaster

This position is responsible for overseeing the safe and efficient movement of trains across a particular territory.  (Maye Decl., ¶ 18.)  A good candidate would have experience overseeing the movement of trains.  *Id*.  Campbell's experience as Road Foreman of Engines was relevant and valuable to this position.  *Id*.  However, he was not selected as he was not found to be the most qualified.  *Id*.  Eric Sams, the selectee, also had relevant and valuable experience as an Assistant Trainmaster, and he also had a B.S. degree in Engineering from Illinois State University.  *Id*.

Other than one example of a white employee who was promoted into a position for which Campbell did not apply, he has not provided any specific information to support his claim.[11]  *Id*. at 128-135.  Upon review of the record, the qualifications Campbell asserts are that he has worked for Norfolk Southern for nineteen years and has transportation and supervisory experience.  (Campbell Dep. II, 132.)

Even if Campbell was able to establish a *prima facie* case of failure to promote, Norfolk Southern has asserted legitimate, non-discriminatory reasons for its actions that Campbell has not shown to be pretextual.  Once an employee establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The burden then shifts back to the employee to make a showing that the stated reason is pretextual.  *Id*. Defendant's burden of articulating a legitimate, nondiscriminatory reason for its decision to discharge a Plaintiff is satisfied if defendant "explains what [it] has done or produces evidence of legitimate nondiscriminatory reasons."  *Id*. at 256 (internal quotation omitted).

Norfolk Southern presented evidence that Campbell did not have similar qualifications as

---

[11]Campbell testified that a white male, who was not employed by Norfolk Southern at the time the white male applied for the position as an analyst (which was internally advertised), received the promotion.  (Doc. No. 36-4 at 128-129.)

the persons selected to fill the positions.  Moreover, it presented evidence that Maye did not have knowledge of Campbell's race at the time selections were made, but instead relied on Campbell's resume to determine he lacked the necessary experience.

Once the defendant meets this burden, then the plaintiff must show pretext.  A plaintiff can establish pretext in three interrelated ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."  *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Campbell argues that Maye's Declaration is speculative as Norfolk Southern did not have a single record indicating the reason for Campbell's rejections.  (Doc. No. 41 at 23.)  In support of this argument, he asserts that Norfolk Southern had to rely on the declaration of a H.R. Generalist, rather than comtemporaneous records, and, therefore, Norfolk Southern's explanations are mere speculation, not legitimate business reasons.  *Id.*

Norfolk Southern counters that it only has the obligation to articulate (not prove) a legitimate, nondiscriminatory reasons for its decision, before the burden shifts to Campbell to demonstrate that the reasons are pretextual.  Campbell, however, has not countered Norfolk Southern's business reasons by addressing the specific jobs he sought or expressing why he was qualified for the positions.

Qualification evidence may suffice, at least in some circumstances, to show pretext.  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 187-188, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (indicating a plaintiff "might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position"), superseded on other grounds by 42 U.S.C. § 1981(b); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination"); *cf. Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105

22

(2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").  Campbell has not presented any evidence as to his qualifications for the positions.

As Campbell has not established a discriminatory failure to promote, the Court recommends that Norfolk Southern's summary judgment motion be granted as to Counts Four, Five, and Six.

### C. Retaliation Claims

In Counts Seven through Nine, Campbell brings a claim for retaliation based upon discriminatory harassment under Title VII, § 1981, and Ohio law.[12]  Specifically, Campbell alleges that Norfolk Southern subjected him to three types of retaliation: (1) the implementation of a rule adding 50 percent to the mileage requirements for Road Foremen in the Dearborn Division; (2) "a string of harassing and retributive actions" by Assistant Division Manager Mike Wilson; and, (3) not selecting Campbell for a number of positions for which he applied.  (Doc. No. 41 at 26-27.)

Norfolk Southern argues that because Campbell's assertion of retaliation based upon failure to promote is not alleged in the Complaint, but raised for the first time in the opposition brief, the Court should not consider it.  (Doc. No. 49 at 18.)

To maintain a claim for retaliation, Campbell must establish that: (1) he engaged in Title VII-protected activity; (2) Norfolk Southern knew that he engaged in the protected activity; (3) Norfolk Southern subsequently took an adverse employment action against him; and (4) the adverse action was causally related to the protected activity.  *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (*quoting Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).

Not every action that an employee dislikes is an "adverse employment action."  *See*

---

[12]The Title VII standards apply to retaliation claims under § 1981 and Ohio law.  *See Lamer v. Metaldyne Co., LLC,* 240 Fed. App'x 22, 28 (6th Cir. 2007).

*Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  Instead, the employer's conduct must effect a "materially adverse change in the terms and conditions of employment."  *Id.*; *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 800 (6th Cir. 2004) (upholding definition of adverse employment action for purposes of Title VII retaliation cases).  An adverse employment action in the retaliation context consists of an action which would dissuade a reasonable worker from making or supporting a charge of discrimination.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006).  "Trivial episodes of unpleasantness or admonition, or other *de minimis* employment actions, standing alone, cannot supply legally sufficient evidence of actionable material discipline or retaliation, even if they were arguably impelled by protected activity."  *Kelly v. Lambda Research, Inc.*, 89 Fed. App'x 535, 545 (6th Cir. 2004) (collecting cases).

While a company may be liable for retaliation where a supervisor engages in severe or pervasive retaliatory harassment, *see, Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007), that has not been demonstrated here.  Generally, courts look for at least a termination of employment, a demotion in wage, salary or job title, a loss of benefits, or a decrease in responsibilities.  *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).  Campbell has suffered none of these.  He presented no evidence that his salary, promotion track, job evaluations, or responsibilities were diminished.  At most, Campbell perceives an attitude of dislike among certain supervisors.  Such an atmosphere, however, is not even close to the adverse action required to constitute retaliation.  *See Trepka v. Board of Educ.*, 28 Fed. App'x 455 (6th Cir. 2002)

Regarding the "Derick Campbell rule," increasing the mileage requirement for Road Foremen from 50 to 75 miles, Campbell has not presented any evidence that its implementation was retaliatory.  It was a neutral rule, applying to all Road Foreman in the Dearborn division.  Moreover, the rule change was made for a legitimate reason, in order to observe whether engineers were able to control the speed of the train. (Sherman Decl., ¶ 10.)  Campbell counters by pointing to Sherman's July 8, 2009 email to him, but to no other Road Foremen:

For your review.

24

> I would like to see a [sic] something different when you are conducting your train rides.  I know that the minimum is 50 miles, but I really don't think that running 50 miles on clear signals, gives us an opportunity to accurately judge the employees ability to control the train, monitor rules compliance and performance.
>
> Any suggestions?

(Doc. No. 47-2.)  It appears that Sherman was merely asking for Campbell's input as to running 50 miles when he asks "[a]ny suggestions?"  Also, the rule was adopted approximately one year after Sherman was in the Road Foreman position, *id*., ¶ 8, and prior to his learning of Campbell's complaints filed with the EEO or the Ohio Civil Rights Commision.  *Id.* ¶ 15.  Campbell fails to establish retaliation based upon race discrimination regarding this new rule.  Moreover, Norfolk Southern has presented a legitimate, non-retaliatory reason for increasing the mileage requirement.

Campbell also claims that the Assistant Division Manager Mike Wilson gave him "contradictory information . . . regarding documentation of a possible crew injury," screamed at him over the telephone, used a derogatory tone of voice, and hung up the telephone abruptly.  These vague incidents, without more, fail to demonstrate adverse acts supporting retaliation.  At most, they involve ordinary workplace disagreements that are not materially adverse and do not serve as a basis of a retaliation claim.  *See LuJan v. Southwest Airlines Co.*, 2008 WL 4791490, *16 (M.D. Tenn. Oct. 28, 2008).

Regarding Campbell's assertion of retaliation based upon failure to promote, even if Campbell had properly raised it in his Complaint, it is meritless.  As previously discussed, Campbell has not established a *prima facie* case of discriminatory failure to promote.  He, therefore, fails to establish the elements of retaliation for engaging in protected activity.  Norfolk Southern submitted evidence showing its reasons for not selecting Campbell for each position.  Campbell has not provided any evidence that he was similarly qualified for the positions.  Moreover, Campbell failed to establish that Norfolk Southern's reasons were pretextual.

Campbell presents insufficient evidence to establish a retaliation claim based on discriminatory harassment.  He also has not established a retaliation claim based on protected activity.  The Court, therefore, recommends that Norfolk Southern's motion for summary

judgment be granted as to Counts Seven, Eight, and Nine.

### V.  Conclusion

It is recommended that Defendant Norfolk Southern's Motion for Summary Judgment be granted, and the case be dismissed with prejudice.

<u>  s/ Greg White                                  </u>
United States Magistrate Judge

Date:   <u>  March 8, 2012  </u>


### <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

26